1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Laurie Smith, an Arizona resident, | CV 13-0405-TUC-RCC (JR) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Mutual of Omaha Insurance Company, a Nebraska corporation, | |
| Defendant. | |

In accordance with the Rules of Practice of the United States District Court for the District of Arizona and 28 U.S.C. § 636(b)(1), this matter was referred to the Magistrate Judge for report and recommendation.

This is an appeal of the denial of short-term disability benefits under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001- brought by Plaintiff Laurie Smith against Defendant Mutual of Omaha Insurance Company ("MOO"). Before the Court are MOO's Motion for Decision on the Administrative

1

1  Record (Doc. 17) and Smith's Response thereto (Doc. 22), and Smith's Motion for

2  Summary Judgment (Doc. 18) and MOO's response thereto (Doc. 23).  The Court

3  held a bench trial on the administrative record on February 18, 2014.  Having

4  reviewed the administrative record, and having considered the pleadings, the

5  Magistrate Judge recommends that the District Court, after an independent review of

6  the record, grant MOO's Motion for Decision on the Administrative Record (Doc.

7  17) and deny Smith's Motion for Summary Judgment (Doc. 18).

8  **I.      FINDINGS OF FACT**

9          **A.      Plaintiff's Employment**

10         Smith, who was born in 1981, formerly worked as a senior photo designer for

11  the Muscular Dystrophy Association ("MDA").  R. 268.[1]  She was hired by MDA in

12  2004.  *Id*.  Her job was sedentary in nature and required that she occasionally carry or

13  lift small items weighing less than 10 pounds and that she occasionally walk or stand.

14  *Id*.  During the summer of 2011, she began experiencing muscle pain, spasms,

15  stiffness, and twitching.  R. 268-69.  She continued to work until January 12, 2012.

16  R. 268.  On February 6, 2012, Smith submitted a claim for benefits under MDA's

17  group Short Term Disability Plan, Policy No. G00038H3 (the "Policy"), which was

18

19  _____

20  [1] The court uses the abbreviation "R" to refer the administrative record, which is filed as
    Document 16 on the docket.  The Court's citations to the record use the last three digits (or
21  fewer) of the bates-stamped number at the bottom right corner of each page.

22

1   issued through MOO.  *Id.*  The Attending Physician's Statement accompanying her

2   claim indicates a diagnosis of "muscle spasticity/myopathy."  R. 269.

3         **B.**     **MOO's Short-Term Disability Policy**

4         Under the Policy, after satisfying a seven day elimination period, Smith was

5   eligible to receive up to 50 percent of her pre-disability income for up to 26 weeks if

6   she satisfied the Policy's requirements.   R. 20-21, 41, 47.   The Policy defines

7   disability as follows:

8         Disability and Disabled means that because of an Injury or Sickness, a
    significant change in your mental or physical functional capacity has
9   occurred in which you are:

10        •     prevented from performing at least one of the Material Duties of
    Your Regular Job on a part-time or full-time basis; and

11

          •     unable to generate Current Earnings which exceed 20% of Your
12  Weekly Earnings due to that same Injury or Sickness.

13        Disability is determined relative to Your ability or inability to work.  It
    is not determined by the availability of a suitable position with Your
14  employer.

15  R. 49.

16        Under the Policy, "Material Duties" are:

17        the essential tasks, functions, and operations relating to your Regular
    Job that cannot be reasonably omitted or modified.  In no event will we
18  consider working an average of more than 40 hours per week in itself
    to be a part of material duties.  One of the material duties of your
19  regular job is the ability to work for an employer on a full-time basis.

20  R. 42.   "Regular Job" is defined as the occupation a claimant is "routinely

21  performing" when the disability begins.  R. 43.

22

3

1    "Injury" is defined as:

2        An accidental bodily injury which is the direct result of a sudden,
         unexpected and unintended external force or element, such as a blow or
3        fall, that requires treatment by a Physician.  It must be independent of
         Sickness  or  any  other  cause,  including,  but  not  limited  to,
4        complications from medical care.  Disability due to such injury must
         begin while You are insured under the Policy.  Injury does not include
5        cosmetic surgery or procedures, or complications resulting therefrom.

6    R. 42.  Sickness is defined as:

7        a disease, disorder or condition, including pregnancy, for which you are
         under the care of a Physician.   Disability must begin while you are
8        insured under the Policy.  Sickness does not include cosmetic surgery
         or procedures, or complications resulting therefrom.  Cosmetic surgery
9        does not include reconstructive surgery when such service is incidental
         to or follows surgery resulting from trauma, infection or other diseases
10       of the involved part.

11   R. 43.

12       **C.      Smith's Medical and Claim History**

13       On November 22, 2011, Smith saw Sarah Sullivan, D.O., complaining of

14   "bilateral muscle spasms and rigidity."  R. 232.  Smith reported that she "sometimes

15   will have muscle pain" and it was occurring with increasing frequency over the

16   previous three to four months.  *Id.*  She stated that her symptoms in her muscles were

17   "like a constant annoying toothache," and reported that the pain was present in her

18   bracioradialis, shoulders, quadriceps, and occasionally in her calves.  *Id.*   The

19   doctor's impression was that Smith's "neurologic exam is concerning for cervical

20   spinal stenosis given global hyperreflexia and increased tone."  R. 234.  Dr. Sullivan

21   recommended that an MRI of the cervical spine be completed and encouraged Smith

22   "not to participate in kickboxing or chiropractic care for now."  *Id.*

4

1    A radiology report dated November 23, 2011, includes an impression of

2  "[c]entral disc protrusion at C6/7 which mildly narrows the ventral subarachnoid

3  space but does not cause cord deformity or canal compromise," and noted that the

4  examination was otherwise unremarkable.  R. 235.  An MRI of the brain performed

5  that same day was reported as normal.  R. 236.  On December 7, 2011, Smith was

6  seen for EMG and nerve conduction tests.  R. 237-45.  The tests included bilateral

7  lower and upper extremities and revealed normal findings with "[n]o evidence for a

8  neuropathy nor a myopathy."  R. 239.

9    Smith was again seen by Dr. Sullivan on January 12, 2012.  R. 246-48.  Dr.

10  Sullivan noted that "[s]ince the patient was last seen by me, she states that she has

11  started to feel significantly better but then worse again over the past one week."  Dr.

12  Sullivan noted the negative EMG results, but also noted that Smith's lab work

13  showed "an elevated CPK of 1123 and an elevated myoglobin of 301."  The lab tests

14  were repeated two weeks later and the CPK had decreased to 626 and the myoglobin

15  had improved to 134.  Another two weeks later, however, the CPK had increased to

16  1030.  R. 246.  Dr. Sullivan recommended additional lab work, including repeated

17  CPK screening.  She also sent Smith for a quadriceps muscle biopsy and another

18  MRI of the cervical spine due to "continued hyperreflexia."  R. 248.

19    On January 20, 2012, a muscle specimen was collected.  Upon examination,

20  the diagnosis was "nonspecific changes" and the examiner commented that "[t]here

21  is mild neurogenic atrophy which may be an incidental finding, along fiber diameter

22  variation, and increased central nuclei."  R. 250-51.

5

On February 1, 2012, Dr. Sullivan completed a Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act). R. 253-56.  Dr. Sullivan indicated that Smith would be unable to sit or stand for prolonged periods due to "continued muscle spasticity, pain, difficulty with walking/balance."  R. 254.  She estimated that Smith would be incapacitated from February 1, 2012 through April 1, 2012, and would require treatment two or three times per month.  R. 255.

On February 6, 2012, Smith submitted a claim for benefits under the Policy. R. 268.  The Attending Physician's Statement accompanying Smith's claim was prepared by Dr. Sullivan and indicates a diagnosis of "muscle spasticity/myopathy." R. 269.  Dr. Sullivan indicated that Smith could never lift any amount of weight, could never bend, squat, stoop, or kneel, and could sit for 30 minutes, be on her feet for 10 minutes, and stand and walk for 5 minutes each.  *Id*.  She indicated that Smith was expected to be disabled from February 1, 2012 through April 1, 2012.  *Id*.

Dr. Sullivan next saw Smith on February 14, 2012.  R. 257-59.  The doctor described Smith with a "history of muscle spasms and discomfort."  At the time, Smith reported "continued cramping and pain which . . . are sometimes worse than others and can occasionally awaken her at night."  R. 257.  Her CPK levels were reported as "[f]luctuating but persistently high."  *Id*.  Also noted were the results of the muscle biopsy.  *Id*.  Dr. Sullivan's impression noted that "[d]ifferential diagnosis remains broad, including an adult onset central nuclear myopathy, mitochondrial myopathy, toxic or viral myopathy.  Inflammatory myopathy is much less likely in

1   the consideration of current muscle biopsy findings."   R. 259.   Dr. Sullivan

2   recommended further lab work and indicated that "evaluation by myopathy specialist

3   at a tertiary care center may be necessary."   Baclofen was prescribed to treat

4   spasticity and Dr. Sullivan decided to "hold off on the use of steroids" until a clear

5   diagnosis was made.  R. 259.

6        On March 7, 2012, MOO approved Smith's STD claim and paid her benefits

7   retroactive to January 19, 2011 (the date upon which she satisfied the Policy's seven

8   day elimination period).  R. 57, 273.

9        At the request of Dr. Sullivan, Smith was seen by Katalin Scherer, M.D., on

10  March 26, 2012.  R. 200, 210.  In her records from that visit, Dr. Scherer summarizes

11  the largely normal laboratory and testing results from Dr. Sullivan, but notes that

12  Smith's CPK levels "have been consistently elevated in the 600-1200 range, despite

13  rest, and she has had several instances of elevated serum myoglobin level."  R. 208-

14  09.  Smith reported her pain level as 5/10, R. 210, and explained that her problems

15  began during "cross-fit" workouts in the fall of 2010.  R. 208.  At the time of the

16  examination, Smith had stopped doing "cross-fit," and was doing about 10 minutes

17  of swimming daily.  R. 208.  Dr. Scherer performed "a complete review of systems"

18  and noted that "[a]ll are unremarkable except . . . hot/cold intolerance, and weight

19  gain."  R. 210.  A nurses intake notes reflect that Smith was there due to myopathy

20  and also indicated that Smith had a history for depression.  *Id*.  On physical

21  examination, Dr. Scherer found Smith "in no apparent distress."  *Id*.

22

7

1       Dr. Scherer believed that Smith's paternal grandfather's history of muscular

2  dystrophy was "probably a red herring," and noted that it "[s]ounds like she has

3  either an autoimmune cramp disorder/myopathy, endocrin[e] myopathy, or more

4  likely a metabolic myopathy (not mitochondrial, and not-McArles, based on prior

5  muscle biopsy)."   R. 211.   Dr. Scherer ordered another muscle biopsy, additional

6  laboratory tests, and a repeat EMG.   *Id.*   She also cautioned Smith not to do any

7  strenuous exercise and to stay hydrated, and indicated she would follow-up with

8  Smith after testing was completed.   *Id.*

9       Dr. Sullivan next saw Smith on March 29, 2012.   R. 200-02.   The doctor noted

10  that Smith had been seen by Dr. Scherer and stated that "[t]esting is pending on the

11  patient and Dr. Scherer has recommended repeat EMG and muscle biopsy which the

12  patient would prefer not to undergo."   R. 200.   Smith reported that she found that

13  hydromorphone, which she was taking up to six times per day, was effective in

14  treating her pain and she was able to swim for ten minutes per day.   *Id.*   She also told

15  Dr. Sullivan that she recently had been fired from her job and was "frustrated that

16  disability has not been continued while testing is pending."   *Id.*   Dr. Sullivan noted

17  that Smith was following up with Dr. Scherer and also referred her for additional

18  testing for cardiac myopathy.   Smith also requested that Dr. Sullivan write a letter to

19  MOO.   R. 202.

20       In a letter to MOO written that same day, Dr. Sullivan reported that Smith was

21  under her care and "continues with extensive neuromuscular testing and is being seen

22  at the MDA clinic at the University of Arizona for the same."   She also indicated that

1   Smith "may not return to work for an additional 3 months (June 29, 2012) until this

2   workup is completed."   She explained that Smith "remains at high risk for muscle

3   injury/break-down and subsequent kidney failure."  R. 228.

4        On April 17, 2012, MOO referred Smith's file for review by Carol Johnson, R.N.,

5   a nurse case manager.  R. 272-76.  After reviewing Smith's medical records, Johnson

6   stated that Smith "does have some myopathy and problems with her muscles as noted

7   by the elevated CPK, and elevated Serum Aldolase."  R. 275.  She noted, however,

8   that Smith "reported activities of 02/14/12 where she is walking her dog up to one

9   mile a day, and on 03/29/12 . . . reported swimming . . . 10 minutes a day," and thus

10  concluded that Smith "would not be precluded from sitting up to 6 hours in a 8 hour

11  day or lifting/carrying up to 10 pounds occasionally."   R. 275.   In conclusion,

12  Johnson opined that:

13          Based on the medical records available for review, the claimant should
            be able to sit for 6 hours in a 8 hour day and lift up to 10 pounds
14          occasionally and 5 pound frequently.  After conferring with the on site
            physician, recommend sending a clarifying letter to Dr. Scherer to see
15          if she would approve the claimant being able to sit for 6 hours in a 9
            hour day with position changes as needed and lifting up to 10 pound
16          occasionally and 5 pounds frequently sine the claimants care has been
            turned over to this provider.
17
    *Id.*
18
         On April 25, 2012, the MOO claims manager assigned to Smith's case sent a
19
    letter to Dr. Scherer.  R. 188-89.  The letter indicates that MOO has reviewed Smith's
20
    records and provides a summary of the records.  *Id.*  Dr. Scherer was asked, based on
21
    the summary of Smith's medical records, if she would agree that Smith "is able to sit
22

1   for 6 hours in a 8 hour day with positional changes as needed and lifting up to 10

2   pounds occasionally and 5 pounds frequently." R. 188.

3        The   next day, Smith faxed an Attending Physician Statement ("APS")

4   completed by Dr. Scherer accompanied by an explanatory note from Smith stating

5   "Attending Physician's Statement form Dr. Scherer – who also said she didn't know

6   me/my medical issues well enough to say whether or not I could/can work." R. 185.

7   In the APS, Dr. Scherer indicated that Smith could occasionally lift and carry 1-5

8   pounds and could sit, stand, walk, and bend for 20 minutes at a time. R. 186. Dr.

9   Scherer indicated that Smith could work with job modifications, but indicated

10  "unknown" in response to inquiries into how long Smith had been disabled, when

11  Smith would be able to work, and what treatment was planned. R. 187.

12       Shortly thereafter, Dr. Scherer faxed MOO a record from Smith's April 26,

13  2012, office visit. R. 94-95. On the fax cover sheet, Dr. Scherer hand wrote "Scam,"

14  followed by a notation that Smith was no longer under her care. R. 178.   In the

15  records accompanying the note, Dr. Scherer reported that Smith arrived as scheduled

16  for a follow-up EMG appointment. R. 94. When taken to the exam room, Smith

17  indicated she had a few questions and "promptly presented . . . disability forms to fill

18  out." When discussing lab results and proposed testing, Dr. Scherer noted that Smith

19  "seemed very concerned about the look of the scar" from her previous biopsy. *Id*.

20  Then, after discussing the EMG procedures, Smith read through the disability

21  paperwork that Dr. Scherer had completed, and stated "that since it seems she won't

22  'get disability' based on what [Dr. Scherer] had written, she could not afford the

1   EMG and wanted to cancel it." *Id*.  Based on their interaction, Dr. Scherer "got the

2   sense that Ms. Smith's priority at this time is being able to obtain disability, and NOT

3   obtaining a diagnosis and subsequent treatment for her muscle cramps." *Id*.  Dr.

4   Scherer reported her objective findings as follows:

> Ms. Smith was comfortably dressed.  She was well groomed.  All her
> toenails were painted pink.  Her legs were freshly shaved.  She moved
> about with ease, and did not have any difficulty walking, standing up
> from the chair, climbing or moving around on the exam table.  She did
> not seem to be in any kind of distress.

8   *Id.*  Dr. Scherer then reported her impression:

> This woman has betrayed my trust and my good faith efforts to
> diagnose and treat the source of her muscle cramps.  It seem that she is
> only interested in obtaining disability at this time, and "asked" to
> cancel a 1 hour procedure for which she was scheduled after we had
> started the visit, and after I had already spent considerable time and
> effort on her case, as soon as she realized that she did not get what she
> wanted (me signing her disability form with answers she wanted) from
> me, she decided to leave.
>
> There is no objective evidence at this time, that Ms. Smith has any kind
> of a neuromuscular disorder.  Elevated CPK/aldolase in themselves is
> not diagnostic of any specific disorder, and although it can be seen in a
> variety of neuromuscular conditions, it can also be a normal result of
> muscle trauma and exercise.  It may also indicate an underlying
> metabolic myopathy, for which I was attempting a good faith
> diagnostic workup, which patient has decided to abort (see above).
>
> I do not feel that I can continue to care for her, as there is no trust.  I
> asked Ms. Smith to seek medical care elsewhere, and she was
> discharged from the MDA clinic at the UA.

R. 94-95.

By letter dated May 1, 2012, MOO denied Smith's claim beyond March 26,

2012.  R. 174-77.  The letter quoted the disability standard from the policy and

1    summarized medical records from Dr. Sullivan, Dr. Carnahan, and Dr. Scherer.  The

2    letter then summarizes MOO's decision:

3          while you do have pain, it is relieved by medication.  Your reported
           activities as of February 14, 2012 were walking your dog up to one
4          mile a day, and on March 29, 2012 your reported activity was
           swimming 10 minutes a day.  The medical information received does
5          not support your inability to perform the Material Duties of your
           Regular Job as a Graphic Designer.  Therefore, no benefits are payable
6          beyond March 26, 2012 and your claim for further benefits has been
           denied.
7
8    R. 175.  The letter advised Smith of her rights to appeal the decision to MOO and to

9    file a civil action pursuant to ERISA after exhausting her administrative appeals.  R.

     176.
10
     On May 21, 2012, Smith was seen by Gordon Watson, M.D., a cardiologist.
11
     R. 130-133.  Dr. Gordon noted that Smith had elevated CPK and myoglobin levels
12
     and that "so far no other abnormalities have been found."  R. 130.  His impression
13
     included no abnormal findings and her exercise tolerance was good.  R. 131.
14
     In June and July 2012, Smith was seen twice by her general practitioner's
15
     office.  R. 118-123.  The records reflect her treatment by the Mayo Clinic and by a
16
     psychologist, but report no new objective findings or a definitive diagnosis.  *Id*.
17
     On August 27, 2012, Smith was again seen by Dr. Sullivan.  R. 146-48.  Dr.
18
     Sullivan again reported her impression of generalized myopathy, and noted that
19
     Smith had been seen by Dr. Scherer and at the Mayo Clinic, but that the underlying
20
     etiology for her myopathy had not been identified.  R. 148.  Dr. Sullivan noted that
21
     she would "recheck CPK and BUN/creatinine to assure stability with regard to
22

12

1    kidney function," and recommended follow-up with other doctors.  *Id.*  Smith was to

2    be seen back in three or four months unless problems arose.  *Id*.

3         On August 28, 2012, Smith was seen by Laurie Bergstrom, M.D., at Catalina

4    Pointe Arthritis and Rheumatology, for muscle pain and weakness.  R. 124-25.  It

5    was noted that Smith reported suffering tremors with activity and had gained weight

6    since her symptoms began.  R. 124.  She was assessed for myopathy, myofascial pain

7    and anthralgias.  R. 125.  Dr. Bergstrom indicated that she would review Smith's

8    prior records, consult with Dr. Sullivan, and order further tests as necessary.  R. 125.

9         Smith appealed the claim denial on September 3, 2012.  R. 159-60.  In her

10   letter to MOO, Smith claimed Dr. Scherer had made "untrue statements" about her.

11   In support of her contention, Smith attached a separate letter detailing her experience

12   with Dr. Scherer, refuting Dr. Scherer's impressions, and noting that contrary to Dr.

13   Scherer's opinion, the Mayo Clinic had diagnosed her with myopathy.  R. 161-163.

14   She further detailed her treatment at the Mayo Clinic, reporting that she was seeing

15   Benn Smith, M.D., who believed that either myopathy or somatization was the source

16   of her pain symptoms.  R. 159.  Smith further explained, however, that she was

17   seeing a psychologist who had ruled out somatization.  *Id*.  Smith also reported that

18   hydromorphone was no longer helping her pain levels so she had been transitioned to

19   morphine.  R. 159-60.

20        On October 17, 2012, MOO sent Smith's entire file to a second nurse case

21   manager for review.  R. 277-81.  After summarizing Smith's medical history, the

22   reviewing nurse concluded that:

13

The claimant has consistent preserved function on examinations.
The claimant demonstrates appropriate cognition on a consistent basis.
Diagnostic testing has been unrevealing in determination of pathology
for symptoms with unremarkable findings.
The reported activity is inconsistent with the stated severity of pain.
No restrictions or limitations are identified from 1/11/12 forward.

R. 281.  The nurse also suggested that MOO consider obtaining Smith's psychiatric and Mayo Clinic records.  *Id*.

By letter dated November 16, 2012, MOO informed Smith that "the medical documentation in file does not support restrictions and limitations due to any functional or psychiatric impairment that would prevent you from performing the material duties of your regular job as a Graphic Designer beyond the date benefits were considered."  R. 113.  The letter also informed Smith that she had the right to file a civil action under ERISA.  *Id.*

## II.    Standard of Review

Under the default standard, courts must conduct a de novo review of a plan administrator's decision to deny benefits.  *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023 (9th Cir. 2008).  However, if the plan unambiguously gives its "administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable."  *Id*.  In this case, MOO does not contend that the Policy confers such discretion.  In a bit of a role reversal, however, Smith argues that the Court must review MOO's decision under an abuse of discretion standard.  However, given that the de novo standard of review does not require the Court to defer to MOO's discretion, *see Muniz v. Amec Constr.*

14

1    *Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010), the Court assumes that Smith

2    would prefer the application of the de novo standard to her claim.

3         The application of a de novo standard of review under ERISA requires the

4    Court to "simply proceed[] to evaluate whether the plan administrator correctly or

5    incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955,

6    963 (9th Cir. 2006). "When conducting a de novo review of the record, the court does

7    not give deference to the claim administrator's decision, but rather determines in the

8    first instance if the claimant has adequately established that he or she is disabled

9    under the terms of the plan." *Muniz*, 623 F.3d at 1295-96. The reviewing court must

10   conduct an "independent and thorough inspection" of the plan administrator's

11   decision and determine if the benefits were correctly or incorrectly denied. *Silver v.*

12   *Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).

13   The inspection of the record enables the trial court to "evaluate the persuasiveness of

14   conflicting testimony and decide which is more likely true." *Kearny v. Standard Ins.*

15   *Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). Under the de novo standard, the plaintiff

16   has the burden of proving that she was entitled to benefits under the terms of the plan

17   at the time benefits were denied. *Muniz,* 623 F.3d at 1296.

18   **III.    Conclusions of Law**

19        **A.    Smith Was Not Disabled After March 26, 2012**

20        The question before the Court is whether Smith has met her burden of

21   establishing by a preponderance of the evidence that she is disabled within the

22   meaning of the Policy's disability provision after March 26, 2012, when her benefits

1   were terminated.  In the Policy, disability is defined as and a significant change in

2   and insured's mental or physical functional capacity which prevents the insured from

3   performing at least one of the material duties of their job on a part-time or full-time

4   basis.  The definition also requires that the insured be unable to generate earnings

5   which exceed 20% of their weekly earnings.

6       Smith contends that she met the Policy's disability standards and that MOO

7   was able to deny her claim only by "carefully selecting evidence that is helpful to the

8   denial while ignoring or disregarding" favorable evidence.  *Plaintiff's Motion for*

9   *Summary Judgment*, p. 7.  She then points out that she "consistently had extremely

10  abnormal lab results, demonstrating CPK/CK levels which were ten times the high

11  end of the normal range and myoglobin levels that were similarly out of the norm."

12  *Id*. at pp. 7-8.  She asserts that Dr. Sullivan and Dr. Scherer correlated the abnormal

13  lab results to less than sedentary limitations and Dr. Sullivan even warned that Smith

14  could not work due to a "heightened risk of liver failure and muscle injury/break-

15  down."  *Id*. at p. 8.  Smith also argues that MOO improperly chose to note that she

16  was somewhat active and had "relatively stable vital signs without a physiologic

17  response to the reported pain," while ignoring that she was a formerly active person

18  who had gained approximately 20 pounds during her course of treatment.  *Id*.

19  Finally, Smith contends that MOO's decision was arbitrary and capricious because it

20  failed to obtain an independent medical examination ("IME") and instead relied on

21  file reviews performed by its nurses in denying the claim.  *Id*. at pp. 10.

22

1    As Smith asserts, her CPK and myoglobin levels were found to be abnormally

2  high after three tests in January 2012.  Based on these tests, Dr. Sullivan assessed

3  Smith with myopathy and recommended further testing, including additional CPK

4  testing.  R. 248.  Although Smith contends that her CPK levels were "consistently"

5  and "extremely" abnormal, there were no tests conducted after January 2012.

6  Additionally, she has ignored Dr. Scherer's statement that "[e]levated CPK/aldolase

7  in themselves is not diagnostic of any specific disorder, and although it can be seen in

8  a variety of neuromuscular conditions, it can also be a normal result of muscle

9  trauma and exercise."  R. 94-95.

10   Faced with Dr. Scherer's statement, and his suspicions that she was attempting

11  to "scam" benefits under the Policy, Smith asserts that the opinion should be ignored

12  because it is inconsistent with that of her treating physician, Dr. Sullivan, and

13  because Dr. Scherer was not a treating physician.  *Plaintiff's Response to*

14  *Defendant's Motion for Decision on Administrative Record*, p. 3.  Contrary to

15  Smith's assertions otherwise, Dr. Sullivan's opinions from February (R. 268-69) and

16  May (R. 83-86) 2012 finding that Smith was disabled from working during the

17  relevant period do not mandate a finding that Smith was disabled under the Policy.

18  The Court is not required under ERISA to accord special deference to the opinions of

19  Smith's treating physician.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,

20  834 (2003).  However, the Court may give appropriate weight to Dr. Sullivan's

21  opinions based on such factors as the length and nature of the doctor-patient

22  relationship, the level of the doctor's expertise, and the compatibility of the doctor's

1   opinion with the other evidence.  *Jebian v. Hewlett–Packard Co. Employee Benefits*

2   *Organization Income Protection Plan*, 349 F.3d 1098, 1109 n. 8 (9th Cir. 2003).

3           Here, the record reflects that Dr. Sullivan saw Smith at least four times during

4   the relevant time period, with her first visit being in November 2011 and her last in

5   August 2012.  R. 232, 246, 200, 146.  Dr. Sullivan is a neurologist, but referred

6   Smith to Dr. Scherer for testing and specialized care.  R. 210 (note of referral), 200

7   (Dr. Sullivan's note that Smith was being seen by Dr. Scherer and additional testing

8   was recommended).  Finally, Dr. Sullivan's opinion is compatible with the January

9   2012 CPK and myoglobin tests in that the test results were consistent with myopathy.

10  However, even Smith admits that myriad subsequent tests did not establish etiology

11  or a more specific diagnosis.  *Plaintiff's Motion for Summary Judgment*, p. 9.  Based

12  on these considerations, the Court gives Dr. Sullivan's opinions some weight, but not

13  controlling weight over the opinion of Dr. Scherer.

14          Smith also contends that Dr. Scherer's opinions should be disregarded because

15  the doctor's statements about her veracity were not valid and were based on

16  animosity borne from Smith's cancelation of testing that she was unable to afford.

17  Smith contends that Dr. Scherer's animosity toward her is illustrated by her reference

18  in the medical records to Smith's painted toe nails and shaved legs.  *Id*.  While

19  Smith's interpretation of what transpired between her and Dr. Scherer is not

20  unreasonable, MOO's interpretation is also reasonable.

21          Dr. Scherer's notes reflect that Smith elected to cancel her scheduled follow-

22  up EMG after she had presented for her appointment and had been taken into the

1   examination room.  According to the doctor's notes, Smith elected to cancel the tests

2   only after Dr. Scherer indicated she could not state that Smith was unable to work.

3   R. 94.  Given that Smith had already been taken into the examination room and had

4   reviewed the procedure with Dr. Scherer's staff, it was reasonable for Dr. Scherer to

5   associate Smith's recalcitrance with the doctor's indication that she could not state

6   that Smith was unable to work.

7        Smith is also critical of Dr. Scherer's notation that she had her toe nails

8   painted and her legs shaved.  As Smith contends, those comments examined in the

9   abstract might sound unwarranted and irrelevant to medical treatment.  However,

10  Smith's umbrage is less warranted when the comments are reviewed in the context of

11  the entire note.  In its entirety, the paragraph in which the statements appear reads as

12  follows:

13        Ms. Smith is comfortably dressed.  She was well groomed.  All her
          toenails were painted pink.  Her legs were freshly shaved. She moved
14        about with ease, and did not have any difficulty walking, standing up
          from the chair, climbing or moving around on the exam table.  She did
15        not seem to be in any kind of distress.

16  R. 94.  The paragraph as a whole paints a picture of someone who is capable of

17  activities that are inconsistent with the levels of pain Smith alleges.  The note

18  describes a person who is able to take care of hygienic needs beyond the basics and is

19  able to move without discomfort.  But, Smith explains, she had just gone for a

20  pedicure as a special treat to help her depression and her husband often had to help

21  her shower and dress.  R. 163.  These assertions do nothing to undermine Dr.

22  Scherer's reports that Smith "moved about with ease" and "did not seem to be in any

1    kind of distress."   In any case, Dr. Scherer's impression of how and why events

2    transpired as they did was at least as reasonable as Smith's interpretation.

3            Smith asserts that MOO's decision was improper because it was selective in

4    its inclusion of unremarkable test results.  She contends that her unremarkable MRI,

5    EMG, muscle biopsy, stress echocardiogram, and work-up at Mayo Clinic do nothing

6    to undermine her reports of extreme pain and her abnormal CPK findings and Dr.

7    Sullivan's diagnosis of myopathy.  *Motion for Summary Judgment*, pp. 9-10.  It is

8    important to note first that Dr. Sullivan's diagnosis was not dispositive of Smith's

9    claim.  In the Ninth Circuit, that "a person has a true medical diagnosis . . . does not

10   by itself establish disability."  *Jordan v. Northrup Grumman Corp. Welfare Benefit*

11   *Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled on other grounds by Abatie v. Alta*

12   *Health Life Ins. Co*., 458 F.3d 955, 969 (9th Cir. 2006).  Moreover, an examination of

13   MOO's final decision denying benefits undermines Smith's contention that MOO

14   was selective in the information it considered.  The denial letter includes a lengthy

15   and thorough inspection of the record.  R. 108-113.  It includes the lab results

16   reflecting elevated CPK and myoglobin.  R. 110.  It also recognizes Dr. Sullivan's

17   opinion that Smith is unable to work.  R. 112.  It was the claims administrator's

18   obligation then, as it is the Court's now, to "evaluate the persuasiveness of

19   conflicting testimony and decide which is more likely true."  *Kearny*, 175 F.3d at

20   1095.  Thus, it was fair then, as it is now, to consider Dr. Scherer's opinion, *see*

21   *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988) ("The subjective judgments of

22   treating physicians are important, and properly play a role in their medical

1  evaluations."), and the numerous unremarkable laboratory and diagnostic test

2  findings to conclude that Smith had not established that she was disabled during the

3  relevant time period.

**B.     MOO Was Not Required To Obtain An IME**

5  Smith's final contention is that MOO's decision was rendered arbitrary and

6  capricious by its failure to obtain an IME.   In support of this assertion, Smith cites

7  *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005).  In *Calvert*, the Sixth

8  Circuit concluded that an IME should have been considered because the medical

9  review was severely inadequate, failed to describe data, and ignored objective

10  findings.  *Id*. at 296.  As discussed above, none of those shortcomings are present in

11  this case.   Without such indications, ERISA does not require that the plan

12  administrator order an IME before making the benefits determination.  *See Rutledge*

13  *v. Liberty Life Assurance Co. of Boston*, 481 F.3d 655, 661 (8th Cir. 2007); *Kushner*

14  *v. Lehigh Cement Co*., 572 F.Supp.2d 1182, 1192 (C.D.Cal. 2008).

15  Moreover, Smith does not identify what would have been gained if an IME

16  had been ordered.   It is undisputed that in January 2012, tests showed elevated CPK

17  myoglobin.  It is also true that Smith consistently complained of pain.  However,

18  other than the abnormal CPK and myoglobin findings, there is little objective

19  evidence supporting Smith's claims.  This is despite the fact that multiple physicians

20  had examined Smith and multiple additional tests had been performed.  These facts,

21  coupled with Dr. Scherer's opinions, are at least of equal weight to the information in

22  the record that is favorable to a finding of disability.  Smith has not identified

1 | anything an IME would have established that would have tipped the scale in her

2 | favor.

3 | **C.      Conclusion**

4 | Under the terms of the Policy, MOO was within its rights to terminate Smith's

5 | short-term disability benefits.  After conducting a de novo review of her claim, the

6 | Court concludes that Smith was not disabled under the terms of the Policy after

7 | March 26, 2012, the date on which her benefits were terminated.

8 | **IV.     Recommendation**

9 | Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the

10 | District Court, after its independent review, **grant** MOO's Motion for Decision on

11 | the Administrative Record (Doc. 17) and **deny** Smith's Motion for Summary

12 | Judgment (Doc. 18).

13 | This Recommendation is not an order that is immediately appealable to the

14 | Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1),

15 | Federal Rules of Appellate Procedure, should not be filed until entry of the District

16 | Court's judgment.

17 | However, the parties shall have fourteen (14) days from the date of service of

18 | a copy of this recommendation within which to file specific written objections with

19 | the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the

20 | Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen (14) days

21 | within which to file a response to the objections.  Replies shall not be filed without

22 |

1   first obtaining leave to do so from the District Court.  If any objections are filed, this

2   action should be designated case number: **CV 13-0405-TUC-RCC**.  Failure to timely

3   file objections to any factual or legal determination of the Magistrate Judge may be

4   considered a waiver of a party's right to *de novo* consideration of the issues.  *See*

5   *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

6          Dated this 10th day of March, 2014.

7

8                                          Jacqueline M. Rateau

9                                          Jacqueline M. Rateau
                                           United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22